UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                         :

NADGIA DIXON,                                :

                              Plaintiff,     :          12 Civ. 7646 (PAE)

                                       :       OPINION & ORDER

                  -v-                 :

                                       :

NBCUNIVERSAL MEDIA, LLC and OXYGEN MEDIA, :
LLC,                                      :

                                       :

                              Defendants.   :

                                       :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Nadgia Dixon brings this action on her own behalf and on behalf of a putative

class of employees of defendants NBCUniversal Media, LLC ("NBCU") and Oxygen Media,

LLC ("Oxygen"), alleging that defendants failed to compensate her for overtime wages, in

violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York

Labor Law ("NYLL"), §§ 191 *et seq.*  Defendants move to compel arbitration of Dixon's claims.

Dixon, in turn, moves to strike certain exhibits filed by defendants in connection with the motion

to compel arbitration.  Dixon also moves for conditional collective action certification.  For the

reasons that follow, defendants' motion to compel arbitration is granted, and Dixon's motions

are denied.

I.      **Background**[1]

        A.      **Factual Background**

Dixon has been employed by Oxygen since February 2006.  Dixon Decl. ¶ 2; Talbert

Decl. ¶ 3.  Shortly after Dixon's employment began, she was promoted to her current position of

production coordinator.  Dixon Decl. ¶ 2.  Dixon continued her employment with Oxygen after

NBCU's predecessor entity[2] acquired Oxygen in fall 2007, *see* Talbert Decl. ¶ 3; Dixon Decl. ¶

2, and she continues to be employed by Oxygen to this day, *see* Dixon Decl. ¶ 1.

NBCU utilizes an alternative dispute resolution procedure called Solutions.  On April 29,

2009, Dixon received an email regarding Solutions that was sent to all NBCU employees.  Dixon

Decl. ¶ 4 & Ex. C; Talbert Decl. ¶ 6 & Ex. B.  At the time the email was sent, General Electric

Company ("GE") owned a majority stake in NBCU (which in turn owned Oxygen).  Talbert

Decl. ¶¶ 3, 7; Talbert MTS Decl. ¶ 3.  The email began:

>    I'm writing to let you know about a change to our existing alternative dispute
>    resolution program, which is used to handle employee issues and concerns.  This
>    updated program is called **Solutions**.  It is being adopted across GE as the
>    standard method for resolving employment-related disputes.

Talbert Decl. Ex. B (emphasis in original).  The email went on to explain that the program

previously had been in place for GE's and NBCU's senior leadership teams, and that it would

"now be rolled out to all non-union employees in the U.S. . . ."  *Id.*  The email directed "[a]ll

---

[1] The facts as related herein are drawn from the parties' submissions in support of and in
opposition to the pending motions, including: the Declaration of Chelley E. Talbert in Support of
Defendants' Motion to Compel Arbitration ("Talbert Decl.") (Dkt. 9), and the exhibits attached
thereto; the Declaration of Nadgia Dixon ("Dixon Decl.") (Dkt. 16-1), and the exhibits attached
thereto; the Reply Declaration of Chelley E. Talbert in Further Support of Defendants' Motion to
Compel Arbitration ("Talbert Reply Decl.") (Dkt. 22), and the exhibits attached thereto; and the
Declaration of Chelley E. Talbert in Opposition to Plaintiff's Motion to Strike ("Talbert MTS
Decl.") (Dkt. 34), and the exhibit attached thereto.

[2] The defendant referred to herein as NBCU was formed in January 2011 as the result of a joint
venture between General Electric Company and Comcast Corporation.  Talbert Decl. ¶ 7.

NBCU employees who meet the above criteria" to ensure that they are familiar with the program and instructed them to, no later than June 30, 2009, access a PowerPoint presentation that served as a training course on the Solutions program. *Id.* The training course also included a link to the version of the Solutions manual current as of April 29, 2009. Talbert MTS Decl. ¶ 4 & Ex. A (the "2009 Manual").

On May 11, 2009, Dixon received another email regarding Solutions, this time from Christina Guzzo, Oxygen's Human Resources Coordinator. Talbert Reply Decl. ¶ 9 & Ex. D. The email, which was addressed to "NBC Uni Oxygen All," stated: "Hi Oxygen . . . We will be holding a brief info Session regarding Solutions, the new alternative dispute resolution program at NBCU, this Wednesday (5/13) at 11 AM . . . . Please make every effort to attend, especially if you have questions." *Id.* Ex. D. This email attached the April 29, 2009 email at the bottom. *Id.* On May 13, 2009, Guzzo sent another email reminder about the information session, attaching both the April 29 and May 11 emails and stating: "Reminder – if you are interested in attending, please join us at 11 AM EST today . . . ." *Id.* ¶ 10 & Ex. E; Dixon Decl. ¶ 5 & Ex. D. Dixon did not attend the information session, because, she attests, she believed it to be optional. Dixon Decl. ¶ 5.

Dixon attests that she never accessed the link to the Solutions manual and therefore never saw the manual until this lawsuit was commenced. Dixon Decl. ¶¶ 4, 6. However, on July 1, 2009, Dixon did complete the PowerPoint training course on the Solutions program. Talbert Decl. ¶ 9 & Ex. D. That course gave an overview of Solutions terms and procedures, and included several slides particularly relevant here. One slide explained that although most GE employees had previously entered into agreements to submit their claims to binding arbitration, rather than going to court, "[s]ome employees . . . were previously exempted from this

requirement . . . .   Now those employees will also be required to bring claims to binding

arbitration rather than to court. . . . *With the introduction of Solutions, these distinctions between*

*employees are being eliminated.*"  *Id.* Ex. C, at 4 (emphasis in original).  Another slide explained

that Solutions will apply to certain "employees working in the U.S. . . . receiving this training

who continue their employment with the Company after July 1, 2009.  This means that by

choosing to continue to work for the Company after July 1, 2009, you are agreeing to be covered

by Solutions after July 1, 2009."  *Id.* at 6.  Finally, another slide explained that "Covered Claims"

are those "arising out of the employment relationship, asserted by or against the Company, that a

court would have authority under applicable law to resolve."  *Id.* at 8.  Among the listed

examples are "[w]age-hour claims."  *Id.*  The presentation stated that Covered Claims "<u>cannot be</u>

<u>brought to court</u> and will not be heard by a jury" and that they can "only be pursued on an

individual basis through Solutions, <u>meaning that no class or collective actions are permitted.</u>"  *Id.*

at 7 (emphases in original).

   Consistent with the summaries in the presentation that Dixon viewed on July 1, 2009, the

2009 Manual defines "Covered Employees" as "U.S.-based . . . current . . . employees . . . not

represented by a labor union who are or were employed by the Company (including any of its

subsidiaries or affiliates that have adopted the procedure), as identified by your business or

component in Appendix A."  2009 Manual, at 4.  Appendix A lists NBCU—although not

Oxygen—as one such entity.  *Id.* at 26.  "The Company" is further defined in the 2009 Manual to

include "GE, any subsidiaries, affiliates, joint ventures, and parents thereof that have adopted the

procedure . . . ."  *Id.* at 4.  The 2009 Manual expressly exempts Universal Parks and Resorts and

Universal Orlando—two wholly owned, indirect subsidiaries of NBCU, *see* Talbert Reply Decl. ¶ 3—from Solutions.  2009 Manual, at 4.[3]

In January 2011, Comcast acquired a controlling stake in NBCU from GE.  Talbert MTS Decl. ¶ 5; *see also* Talbert Decl. ¶ 7.  In late 2010, NBCU had begun drafting minor revisions to the 2009 Manual in response to recent legislation.  Talbert MTS Decl. ¶ 5.  Those changes culminated in the most current version of the Solutions manual, dated January 28, 2011.  *Id.* ¶ 7; Talbert Reply Decl. ¶ 8 & Ex. C (the "2011 Manual").  The 2011 Manual contains only one change potentially material here:  In defining Covered Employees as non-represented employees of "The Company," the 2011 Manual defines "The Company" as NBCU and its subsidiaries, rather than GE and its subsidiaries.  2011 Manual, at 4.

In all other relevant respects, the 2009 and 2011 Manuals are identical.  Both state that the Solutions procedure "creates a binding obligation on Covered Employees and the Company for the resolution of employment disputes."  2011 Manual, at 2; 2009 Manual, at 2.  Both state that:

> Covered Employees and the Company are not allowed to litigate a Covered Claim in any court. . . .   Covered Employees and the Company waive their right to bring any Covered Claims as, or against, a representative or member of a class or collective action . . . unless all parties agree to do so in writing.  All Covered Claims must be brought on an individual basis only in Solutions.

2011 Manual, at 7; 2009 Manual, at 7.  Both define "Covered Claims" as "all claims that arise out of or are related to an employee's employment . . . where a court in the jurisdiction in question would otherwise have the authority to hear and resolve the claim[,]" including specific

---

[3] The September 17, 2010 version of the Solutions manual, which defendants attached to their motion to compel, is identical to the 2009 Manual with regard to the provisions relevant herein. *See* Talbert Decl. Ex. B.  The September 17, 2010 version, however, was a draft version that was never circulated to NBCU employees, Talbert MTS Decl. ¶ 8, and therefore is irrelevant to this motion.

examples such as claims "relating to compensation."  2011 Manual, at 5; 2009 Manual, at 5.

Finally, although the two versions of the manual differ in their precise definition of "The

Company" as related to Covered Employees, both specifically exempt two NBCU subsidiaries,

but not Oxygen, from coverage.  2011 Manual, at 4 n.2; 2009 Manual, at 4 n.2.

On November 2, 2011, Dixon and other NBCU employees received an email notifying

them of the changes to Solutions reflected in the 2011 Manual.  Talbert Reply Decl. ¶ 5 & Ex. A.

That email explained that "[e]mployees who were previously covered by Solutions will continue

to be covered by the procedure."  *Id.*  The email attached the 2011 Manual, and a document

summarizing the changes.  *Id.* Exs. A–C.

At no point has Dixon attempted to resolve her claims pursuant to the Solutions

procedure.  Talbert Decl. ¶ 10.  She attests that she understood Solutions to be optional to her,

because an employee handbook that she received from NBCU states, under the heading "Dispute

Resolution," that "[e]mployees are encouraged and **may** be required to resolve disputes with the

Company by means of the procedures set forth in Solutions."  Dixon Decl. ¶ 3 & Ex. B

(emphasis supplied by Dixon).

### B.    Procedural History

On October 12, 2012, Dixon filed her Complaint.  Dkt. 1.  On February 19, 2013,

defendants moved to compel arbitration.  Dkt. 8 ("Def. Arb. Br.").  On March 18, 2013, Dixon

opposed that motion.  Dkt. 16 ("Pl. Arb. Br.").  On April 8, 2013, defendants filed a reply.  Dkt.

21 ("Def. Arb. Reply Br.").

On April 12, 2013, Dixon filed a motion to strike the exhibits attached to the Reply

Declaration of Chelley Talbert in Support of Defendants' Motion to Compel Arbitration (Dkt.

22), or, in the alternative, a motion for leave to file a sur-reply.  Dkt. 25 ("Pl. MTS Br.").  On

April 29, 2013, defendants opposed the motion to strike, but did not oppose Dixon's request for leave to file a sur-reply.  Dkt. 33 ("Def. MTS Br.").  On May 9, 2013, Dixon filed a reply in further support of the motion to strike.  Dkt. 36 ("Pl. MTS Reply Br.").  On May 15, 2013, the Court issued an Order granting Dixon leave to file a sur-reply regarding the motion to compel, and stating that it would address the merits of the motion to strike in this opinion.  Dkt. 37.  On May 23, 2013, Dixon filed a sur-reply.  Dkt. 38 ("Pl. Arb. Sur-reply Br.").

On March 28, 2013, Dixon filed a motion for conditional collective action certification under the FLSA.  Dkt. 19–20.  On April 15, 2013, defendants opposed that motion.  Dkt. 26–27, 30–31.  On April 22, 2013, Dixon filed a reply.  Dkt. 32.

## II.     Motion to Strike Reply Exhibits

In their motion to compel arbitration, defendants initially relied on a version of the Solutions manual dated September 17, 2010.  *See* Talbert Decl. Ex. B (the "2010 Manual").  After Dixon argued that this manual did not apply to her, defendants included in their reply papers the 2011 Manual, the November 2, 2011 email that transmitted it to employees, and the document that explained the changes made to the 2011 Manual.  *See* Talbert Reply Decl. Exs. A–C.[4]  Dixon thereupon moved to strike these reply exhibits, or, in the alternative, for leave to file a sur-reply.  In opposing the motion to strike, defendants conceded that they had mistakenly attached the draft 2010 version of the manual, rather than the current version (the 2011 Manual)

---

[4] Defendants' reply exhibits also include two emails, addressed to Oxygen employees, sent on May 11 and May 13, 2009, reminding them about the upcoming information session on Solutions.  *See* Talbert Reply Decl. Exs. D–E.  These exhibits directly respond to Dixon's argument, *see* Pl. Arb. Br. 21, that the April 29, 2009 email was insufficient to give her notice of Solutions because it was only addressed to NBCU employees, not Oxygen employees.  These exhibits are properly filed in reply.  *See Bayway Ref. Co. v. Oxygenated Mktg & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000) ("[R]eply papers may properly address new material issues raised in the opposition papers." (citation omitted)).

or the version that was circulated to employees in 2009 along with the training course (the 2009 Manual). Talbert MTS Decl. ¶¶ 7–8.

"A district court enjoys broad discretion . . . to consider arguments made for the first time in a reply brief, [and] to rely on evidence submitted with the reply papers." *Compania del Bajo Caroni (Caromin), C.A. v. Bolivarian Rep. of Venez.*, 341 F. App'x 722, 724 (2d Cir. 2009) (summary order) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)); *accord Bayway Refining Co. v. Oxygenated Marketing & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000). Although "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden," *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010), a court may choose to admit such evidence where the opposing party will suffer no prejudice. *Id.*; *see Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 144 (E.D.N.Y. 2012).

Here, defense counsel has candidly admitted that the failure to attach the correct version of the Solutions manual was a mistake by counsel. *See* Talbert MTS Decl. ¶¶ 7–8. The only prejudice caused by this error is the fact that Dixon, instead of addressing the 2009 or 2011 Manuals, devoted part of her opposition to the motion to compel to the argument that the 2010 Manual did not apply to her, because it applied only to GE and its subsidiaries. *See* Pl. Arb. Br. 12–18. This prejudice is cured by the Court's previous decision, *see* Dkt. 37, to grant Dixon leave to file a sur-reply. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 648 n.9 (S.D.N.Y. 2011); *Pagan*, 287 F.R.D. at 144; *Revise Clothing*, 687 F. Supp. 2d at 387. This is especially so given that Dixon was not unfairly surprised by the reply exhibits—she had received each of them on her work email account. *Cf. Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 53 (2d Cir.

1996) (no abuse of discretion in relying on affidavit filed in reply, where opposing party was fully aware of defense asserted therein).  Moreover, as noted, the 2009, 2010, and 2011 versions of the Solutions manual are identical in all material respects, save the definition of "The Company" as it relates to the definition of "Covered Employees."  *See* p. 12, *infra*.  Dixon has had the opportunity, in her sur-reply, to address this change.  *See* Pl. Arb. Sur-reply Br. 3. Accordingly, the Court declines to strike the reply exhibits.

### III.    Motion to Compel Arbitration

Defendants move to compel arbitration, arguing that the parties entered a binding arbitration agreement, *i.e.*, Solutions, that covers Dixon's claims, when Dixon continued her employment beyond July 1, 2009, the program's effective date.  In opposing this motion, Dixon argues that (1) she is not bound by Solutions, *see* Pl. Arb. Br. 12–22; and (2) the collective action waiver provision in Solutions is unenforceable, *see* Pl. Arb. Br. 5–12.  The Court addresses these arguments in turn.

#### A.  Applicable Law

Section 2 of the Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "This provision establishes 'a liberal federal policy favoring arbitration agreements.'"  *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration.").

To determine whether to send an action to arbitration, a court must determine (1) whether the parties agreed to arbitrate; (2) the scope of the agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some but not all claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (citing *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)); *accord Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857–58 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." (emphasis omitted)).[5]

Section 4 of the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. It is a "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010)). That is, "[a]rbitration is strictly 'a matter of consent.'" *Granite Rock*, 130 S. Ct. at 2857 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). In determining whether an arbitration agreement has been entered into, the Court "applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v.*

---

[5] The second and fourth inquiries are not disputed here. Dixon does not argue—nor could she— that her claims fall outside the scope of the Solutions. *See* 2011 Manual, at 5 (defining "Covered Claims" as "all claims that arise out of or are related to an employee's employment," including such examples as "[c]laims relating to compensation"); 2009 Manual, at 5 (same); *see also Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) (citation omitted) (doubts regarding the scope of an arbitration agreement "should be resolved in favor of coverage"). And, as discussed *infra*, all of her claims are arbitrable.

*Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *accord Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) ("[I]t is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends.").

The FAA "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit*, 132 S. Ct. at 669. "That is the case even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Id.* (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)); *accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."). "If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (citation omitted); *see Mitsubishi Motors*, 473 U.S. at 627 ("[I]t is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable."). The burden is on the party opposing arbitration to show that Congress intended to preclude a waiver of the judicial forum. *See CompuCredit*, 132 S. Ct. at 669; *Gilmer*, 500 U.S. at 26; *Shearson/Am. Exp.*, 482 U.S. at 227.

### B. Dixon is Bound By Solutions

Dixon argues that Solutions, even if otherwise enforceable, does not bind her to arbitrate her claims because (1) by its terms, Solutions does not apply to Oxygen employees, *see* Pl. Arb. Br. 12–18; and (2) Dixon never entered into an agreement to arbitrate her claims, *see* Pl. Arb. Br. 19–22. Both arguments are unavailing.

11

### 1.  Both NBCU and Oxygen Employees are Covered

The 2009 Manual defines "Covered Employees" to include non-union U.S.-based employees of "the Company (including any of its subsidiaries or affiliates that have adopted the procedure), as identified by your business or component in Appendix A."  2009 Manual, at 4. "The Company" is defined as "GE [and] any subsidiaries . . . thereof that have adopted the procedure."  *Id.*  Appendix A, in turn, lists such subsidiaries, including NBCU.  *Id.* at 26.  Dixon therefore argues that Solutions does not apply to her, because she is employed by Oxygen, not by NBCU.[6]  However, Oxygen is a subsidiary of NBCU, and thus an indirect subsidiary of GE.  *See* Talbert Decl. ¶ 3; Dixon Decl. ¶ 1; Talbert MTS Decl. ¶ 3; *see also* Dixon Decl. ¶ 2 ("For a time my paychecks came from [GE] as Disbursing Agent for [Oxygen].").  Thus, because Solutions applies by its terms to GE and its subsidiaries, it applies to Oxygen employees.  This is confirmed by the fact that the 2009 Manual specifically exempts two NBCU subsidiaries— Universal Parks and Resorts and Universal Orlando—from its coverage.  *See* 2009 Manual, at 4 n.2.  If Solutions did not apply to subsidiaries of NBCU, this specific exemption would be superfluous.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."); *accord Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Trust Co. of N.Y.*, 94 N.Y.2d 398, 404 (2000).

---

[6] This argument is difficult to square with Dixon's assertion in her Complaint that she *is* employed by NBCU.  *See* Compl. ¶¶ 1, 5.

The 2011 Manual, which updates the 2009 Manual, is consistent with this conclusion.[7] In its parallel provision defining "Covered Employees" as non-union U.S.-based employees of "the Company," it states that "[t]he Company includes [NBCU], any subsidiaries, affiliates, joint ventures, and parents thereof that have adopted the procedure."  2011 Manual, at 4.  This change in the definition of "the Company" from GE to NBCU reflects that, in January 2011, Comcast bought the controlling stake in NBCU from GE.  *See* Talbert MTS Decl. ¶¶ 3, 5.  Thus, whether Dixon was a direct employee of NBCU does not determine whether Solutions covers her claims: She was an employee of Oxygen, a non-exempt NBCU subsidiary, and therefore is covered under the terms of both the 2009 and 2011 Solutions manuals.

## 2.   Dixon Agreed to Arbitrate

"[I]n deciding whether a contractual obligation to arbitrate exists, 'courts should generally apply state-law principles that govern the formation of contracts.'"  *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (quoting *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 48 (2d Cir. 2000)).  "It is 'well settled' under New York law that arbitration will not be compelled absent the parties' 'clear, explicit and unequivocal agreement to arbitrate.'"  *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7–8 (2d Cir. 2009) (summary order) (quoting *Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144 (2008)).  A contract may be formed by conduct, rather than words, that manifests the parties' mutual assent. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 582 (2d Cir. 2006); *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93–94 (1999).  Thus, "[a]n employee may consent to a modification to the terms of employment by continuing to work after receiving

---

[7] Dixon argues that the 2011 Manual cannot bind her to arbitration, because it was never communicated to her that her continued employment would be construed as acceptance of the terms set forth in the 2011 Manual.  *See* Pl. MTS Br. 3–4; Pl. Arb. Sur-reply Br. 4–9.  That argument will be addressed in Part III.B.2, *infra*.

notice of the modification." *Manigault*, 318 F. App'x at 8 (citing *Bottini v. Lewis & Judge Co.*, 621 N.Y.S.2d 753, 754 (1995)).

Here, Dixon received an email on April 29, 2009, that informed her that Solutions would be rolled out to NBCU employees.  Talbert Decl. Ex. B.  The email contained a link to a PowerPoint training course, which in turn included a link to the 2009 Manual.  *Id.* Exs. B–C; Talbert MTS Decl. ¶ 4.  Dixon attests that she never followed the link to the 2009 Manual, and did not view the manual until this litigation began.  Dixon Decl. ¶¶ 4, 6.  However, Dixon *did* complete the training course on Solutions.  Talbert Decl. ¶ 9 & Ex. D.  That course consisted of the PowerPoint presentation which explicitly informed Dixon of the binding nature of the Solutions program and that it applied to her and her claims.  *See* Talbert Decl. Ex. C, at 4–8.  It further expressly stated that no class or collective actions would be permitted, *id.* at 7, and notified Dixon that "by choosing to continue to work for the Company after July 1, 2009, you are agreeing to be covered by Solutions after July 1, 2009."  *Id.* at 6.  Under these circumstances, Dixon's continued employment beyond July 1, 2009 constituted acceptance of the binding arbitration agreement contained in the 2009 Manual.  *See Manigault*, 318 F. App'x at 8 (employee bound by arbitration agreement where she failed to rebut presumption that she had received a mailing containing notice of arbitration agreement, and continued with her employment); *Raniere v. Citigroup, Inc.*, 827 F. Supp. 2d 294, 307–08 (S.D.N.Y. 2011) (employee bound by arbitration agreement where she continued employment after opening an email containing a link to a revised arbitration policy that included a collective action waiver, even though employee did not acknowledge receipt of the revised policy, had previously acknowledged receipt of a prior version of the arbitration policy which did *not* contain a collective action waiver, and court noted that "[o]pening an email that contains a link to a

Handbook and arbitration policy, if that link is not followed, is more attenuated and potentially

significantly so, than providing an acknowledgement of receipt"); *Brown v. Coca-Cola Enters.,*

*Inc.*, No. 08-CV-3231 (JFB)(ETB), 2009 WL 1146441, at *7–8 & n.3 (E.D.N.Y. Apr. 28, 2009)

(employee bound by arbitration agreement where he (1) received a brochure and program

description both informing him that continued employment constituted agreement to submit

disputes to arbitration; (2) attended orientation session on arbitration program which similarly

informed him that continued employment constituted agreement; and (3) continued to be

employed past implementation date); *Gonzalez v. Toscorp Inc.*, No. 97 Civ. 8158 (LAP), 1999

WL 595632, at *2 (S.D.N.Y. Aug. 5, 1999) (employee bound by arbitration agreement where he

received policy and handbook and continued employment past effective date, even though he did

not sign acknowledgment of receipt).[8]

　　Dixon nevertheless argues that the 2009 Manual is irrelevant, because it was updated by

the 2011 Manual.  She frames the issue as one of contract modification:  Although she maintains

that she never assented to the terms of the 2009 Manual, she argues that, in any event, defendants

have failed to show that Dixon assented to the revised terms of the 2011 Manual.  *See* Pl. MTS

3–4; Pl. Arb. Sur-reply 4–9.  This, too, is unpersuasive.  As discussed, Dixon was already bound

by the terms of the 2009 Manual.  On November 2, 2011, she received a copy of the 2011

---

[8] *Alvarez v. Coca-Cola Refreshments, USA, Inc.*, No. 12 Civ. 234 (BMC), 2012 WL 1940858
(E.D.N.Y. May 29, 2012) is not to the contrary.  There, Coca-Cola attested that it had sent a
brochure describing the binding arbitration program to its employees; Nunez, the employee in
question, attested that he had never received such materials nor attended an orientation session.
*Id.* at *2.  Faced with these competing declarations, the court declined to apply a rebuttable
presumption that Nunez had received the materials, and found that an issue of fact existed as to
whether Nunez had read them.  *Id.* at *3.  Accordingly, the court could not say that Nunez's
continued employment manifested his assent to Coca-Cola's proposed arbitration agreement.  *Id.*
Here, by contrast, there is no dispute that Dixon received several emails regarding the Solutions
program and completed the training program.  Thus, her continued employment manifested
assent to the arbitration agreement.

Manual in her email; the email that transmitted it to her explained that "[e]mployees who were previously covered by Solutions will continue to be covered by the procedure."  Talbert Reply Decl. Ex. A.  The email also attached a document that explained the few, minor changes made from the 2009 to 2011 versions of the manual, none of which are material to Dixon's claims.  *See id.* Ex. B.  Having already instructed Dixon in 2009 that her continued employment constituted acceptance of the terms of Solutions, it was sufficient for NBCU to expressly remind her that, despite the minor changes made to the manual, employees who were previously covered—such as Dixon—would continue to be covered.  Thus, for the same reasons she was bound by the 2009 Manual, she is also bound by the updated 2011 version.  *See Manigault*, 318 F. App'x at 8 ("An employee may consent to a modification to the terms of employment by continuing to work after receiving notice of the modification."); *Raniere*, 827 F. Supp. 2d at 307–08; *Brown*, 2009 WL 1146441, at *7–8 & n.3; *Gonzalez*, 1999 WL 595632, at *2.

Finally, Dixon appears to argue that she cannot be bound by Solutions because she did not understand it to apply to her.  *See* Dixon Decl. ¶ 3 ("I understood . . . that Solutions was voluntary for me.").  Her misunderstanding is apparently based on a statement in an NBCU employee handbook which says that "[e]mployees are encouraged and may be required to resolve disputes with the Company by means of the procedures set forth in Solutions."  *Id.* Ex. B.  However, the use of the term "may" in this handbook does not support the proposition that Solutions did not apply to Dixon; it simply reflects that not all employees and not all claims are covered by Solutions.  The explicit terms of the manuals that Dixon received, and the descriptions provided in the training course she completed, gave Dixon ample notice that she was required to utilize Solutions.  *See, e.g.*, 2011 Manual, at 2 ("This Procedure . . . creates a binding obligation on Covered Employees and the Company for the resolution of employment

16

disputes."); 2009 Manual, at 2 (same); Talbert Decl. Ex. C, at 4–6.  Moreover, in addition to the

clear language of the training course, the very fact that Dixon was required to (and did) complete

the course renders the inference she purports to have drawn unreasonable.  In light of the clear

language communicating to Dixon that she was a covered employee whose continued

employment would constitute a binding agreement to arbitrate her covered claims, her claimed

subjective misunderstanding of these terms does not relieve her from the obligation to arbitrate.

*See Brown*, 2009 WL 1146441, at *7 n.3 (employee's subjective understanding that his

continued employment did not constitute acceptance insufficient to defeat motion in light of

clear language in materials he received); *see also Morris v. Snappy Car Rental*, 84 N.Y.2d 21, 30

(1994) (fact that plaintiff did not read terms of agreement is no bar to its enforcement where

relevant provisions were set forth in clear and legible manner and there was no allegation of

deceptive or high pressure tactics).

### C.  The Collective Action Waiver is Enforceable

Dixon also argues that, even if the terms of Solutions purport to bind her to arbitrate her

claims, the provision of Solutions that purports to waive collective action rights—such as the

FLSA collective action claim Dixon asserts here—is unenforceable *per se*.[9]  *See* Pl. Arb. Br. 5–

---

[9] Dixon does not argue that the effective vindication of federal statutory rights rationale applies to her claims.  *See In re Am. Express Merchs. Litig.* (*"AmEx III"*), 667 F.3d 204 (2d Cir. 2012) (class action waiver that effectively precludes plaintiffs from enforcing their federal statutory rights by making it financially impossible to vindicate those rights is unenforceable), *cert. granted sub nom. Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 594.  Quite the contrary, she concedes that her claim is sufficiently large to pursue effectively on an individual basis.  *See* Pl. Arb. Br. 23–24.  Nevertheless, Dixon argues that the Court should permit discovery so that she may ascertain "if there are collective action potential members with small dollar claims who will opt into the class and who could easily satisfy the [*AmEx*] standard." *Id.* at 23.  It would be contrary to the Second Circuit's instruction that "each waiver must be considered on its own merits, based on its own record," *AmEx III*, 667 F.3d at 219, to allow Dixon to avoid arbitrating her own claims based on the hypothetical possibility that there may be some other, as-yet-unknown plaintiff as to whom the effective vindication rationale applies.

12.  As noted, to succeed on such a claim, Dixon bears the burden of showing that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.  *See CompuCredit*, 132 S. Ct. at 669; *Gilmer*, 500 U.S. at 26; *Shearson/Am. Exp.*, 482 U.S. at 227.

Employees cannot waive the FLSA's substantive guarantees by private agreement.  *See Genesis Healthcare Corp. v. Symcyzk*, 133 S. Ct. 1523, 1527 (2013) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."); *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945) ("No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act."); *Bormann v. AT&T Commc'ns, Inc.*, 875 F.2d 399, 401 (2d Cir. 1989) ("[P]rivate waiver of claims under the [FLSA] has been precluded by such Supreme Court decisions as [*Brooklyn Sav. Bank*].").  The Second Circuit has not yet addressed the issue whether an employee's right to proceed collectively under the FLSA can be waived in an arbitration agreement.  *See Torres v. United Healthcare Servs., Inc.*, No. 12 CV 923 (DRH)(ARL), 2013 WL 387922, at *4 (E.D.N.Y. Feb. 1, 2013); *Raniere*, 827 F. Supp. 2d at 310.[10]  Those circuits that have addressed the issue have each found nothing in the text of the FLSA, its legislative history, or any inherent conflict between arbitration and the FLSA's purpose, that would indicate congressional intent to preclude waiver of FLSA collective action claims.  *See Owens v. Bristol Care, Inc.*, 702 F.3d 1050, 1055 (8th Cir. 2013); *Vilches v. Travelers Co.*, 413 F. App'x 487, 494 n.4 (3d Cir. 2011); *Carter v. Countryside Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002); *Horenstein v. Mortg. Market, Inc.*, 9 F. App'x 618, 619 (9th Cir. 2001); *cf. Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1378 (11th Cir. 2005)

---

[10] It may soon:  *Raniere*, which presents the issue, is currently on appeal and was argued on March 20, 2013.  *See* No. 11-5213.

(upholding collective action waiver against challenge that it is unconscionable under state law). Similarly, every district court in this circuit to have addressed the issue, save one, has held that FLSA collective action waivers are not unenforceable *per se*. *See, e.g.*, *Ryan v. JPMorgan Chase & Co.*, No. 12 Civ. 4844 (VB), 2013 WL 646388, at *4 (S.D.N.Y. Feb. 21, 2013); *Torres*, 2013 WL 387922, at *4; *Cohen v. UBS Fin. Servs., Inc.*, No. 12 Civ. 2147 (BSJ)(JLC), 2012 WL 6041634, at *4 (S.D.N.Y. Dec. 4, 2012); *LaVoice v. UBS Fin. Servs. Inc.*, No. 11 Civ. 2308 (BSJ)(JLC), 2012 WL 124590, at *6 (S.D.N.Y. Jan. 13, 2012); *Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 304 (S.D.N.Y. 2010). *But see Raniere*, 827 F. Supp. 2d at 314.[11]

This Court joins the vast majority of courts in holding that the right to proceed collectively under the FLSA can be waived in an arbitration agreement. The decision in *Raniere* runs contrary to recent Supreme Court precedent: Plaintiffs may be held to their agreement to arbitrate their substantive claims, even where certain procedural rights, such as the ability to proceed as a class or collectively, are unavailable in arbitration. *See, e.g.*, *Concepcion*, 131 S. Ct. at 1748 ("Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA."); *Gilmer*, 500 U.S.

---

[11] The National Labor Relations Board has held that a waiver of the right to pursue a FLSA collective action in any forum violates the National Labor Relations Act ("NLRA"). *See In re D.R. Horton, Inc.*, 357 NLRB No. 184, 2012 WL 36274 (Jan. 3, 2012). However, that decision may have been decided without a proper quorum. *See Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), *cert. petition filed* (Apr. 25, 2013). Moreover, the Board's decision is entitled to no deference insofar as it purports to interpret the FAA and to apply Supreme Court precedent in the area of arbitration, and to reconcile both with the NLRA, *see Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 144 (2002) ("[W]e have accordingly never deferred to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA."), and courts of persuasive authority have, by an overwhelming majority, rejected its reasoning, *see Owen*, 702 F.3d at 1053–54; *Ryan*, 2013 WL 646388, at *4; *Torres*, 2013 WL 387922, at *8–9; *Cohen*, 2012 WL 6041634, at *4; *see also* Def. Arb. Reply Br. App'x 1 (collecting cases). *But see Herrington v. Waterstone Mortg. Corp*, No. 11-cv-779-bbc, 2012 WL 1242318, at *4–5 (W.D. Wis. Mar. 16, 2012).

at 32 (upholding waiver of identical collective action provision in Age Discrimination in Employment Act ("ADEA"));[12] *see also Owen*, 702 F.3d at 1054 (describing decisions allowing waiver of FLSA collective action rights as "consistent with more than two decades of pro-arbitration Supreme Court precedent").

Although an employee has the "right" to bring an action on behalf of any employee and the "right" to become a party plaintiff to such an action, *see* 29 U.S.C. § 216(b), the statute does not specify whether these rights are substantive or procedural.  The Supreme Court has recently expressed skepticism whether the FLSA's collective action provision is substantive.  *See Genesis*, 133 S. Ct. at 1530, 1532 (observing that, unlike a Rule 23 class, collective action certification "does not produce a class with an independent legal status, or join additional parties to the action.  The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court. . . . Whatever significance 'conditional certification' may have in § 216(b) proceedings, it is not tantamount to class certification under Rule 23."); *see also Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (referring to identical collective action provision of ADEA as granting the court "the requisite procedural authority to manage the process of joining multiple parties").  Consistent with this, the Second Circuit has described the

---

[12] *Gilmer* is distinguishable, because in that case collective actions were permitted in arbitration, *see* 500 U.S. at 32, whereas here no such collective action mechanism is available under Solutions, *see* Talbert Decl. Ex. C, at 7.  In *Gilmer*, the Court strongly suggested that the right to proceed collectively could be waived even if unavailable in arbitration:  "But even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the ADEA provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred."  *Gilmer*, 500 U.S. at 32 (citation and alteration omitted).  However, the Second Circuit has characterized this statement as dicta and declined to rely on it.  *See In re Am. Express Merchs. Litig. ("AmEx II")*, 634 F.3d 187, 196 (2d Cir. 2011), *adhered to on rehearing*, 667 F.3d 204 (2d Cir. 2012), *cert. granted sub. nom. Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 594.  Accordingly, the Court does not treat *Gilmer* as squarely controlling the outcome here.

FLSA's collective action right as a "procedural mechanism[]" for pursuing substantive FLSA claims. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 244 (2d Cir. 2011); *accord Myers v. Hertz Corp.*, 624 F.3d 537, 542 (2d Cir. 2010); *see also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 164 (S.D.N.Y. 2008) (Lynch, J.) ("It is far more natural to see the opt-in provisions of the FLSA, like the class action rules they resemble, simply as procedural mechanisms for vindication of the substantive rights provided by the FLSA."). Therefore, because "the right to proceed collectively is procedural, [it] can be waived." *Ryan*, 2013 WL 646388, at *3; *cf. Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013) (finding no substantive statutory right for a private plaintiff to bring a pattern-or-practice claim under Title VII, and holding that "there can be no entitlement to the ancillary class action procedural mechanism").

Nothing in the FLSA is to the contrary. The statute's plain text requires that an employee affirmatively opt in to any collective action. 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). It follows that the ability to proceed collectively is an option that an individual may waive—either by simply declining to opt in, or by agreeing to arbitration that precludes collective action. *See Owen*, 702 F.3d at 1052–53; *Torres*, 2013 WL 387922, at *5; *cf. CompuCredit*, 132 S. Ct. at 671 (collecting Supreme Court cases holding that statutory right to bring a claim in court does not preclude individual's ability to waive that right in arbitration agreement).

To the extent the legislative history is relevant, although the statute's text is plain, *see, e.g.*, *BedRoc Ltd. v. U.S.*, 541 U.S. 176, 183 (2004), it does not demonstrate congressional intent to preclude waiver of FLSA collective action claims. *See Torres*, 2013 WL 387922, at *6

(examining the legislative history and stating that "[i]f anything, the legislative history makes clear that Congress amended the FLSA for the specific purpose of adding a requirement that an employee take the affirmative step of opting-in before he can avail himself of the right to participate in a collective action"); *see also Owen*, 702 F.3d at 1053 (noting that the FAA was reenacted after the passage of the FLSA, the NLRA, and the Norris-LaGuardia Act, and observing that "[t]he decision to reenact the FAA suggests that Congress intended its arbitration protections to remain intact even in light of the earlier passage of three major labor relations statutes"). *But see Raniere*, 827 F. Supp. 2d at 311–14 (finding that legislative history supports the conclusion that collective action rights cannot be waived).

"The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1748.  Had Congress intended to override this purpose in the FLSA, "it would have done so in a manner less obtuse than what [Dixon] suggests." *CompuCredit*, 132 S. Ct. at 672.

Defendants' motion to compel arbitration is granted.

### D.  Dismissal or Stay

The FAA provides that, where the asserted claims are "referable to arbitration," the court shall "stay the trial of the action until such arbitration has been had."  9 U.S.C. § 3.  Defendants nevertheless ask this Court to dismiss, rather than stay, the case, because all of Dixon's claims are subject to arbitration.  *See* Def. Arb. Br. 19.  Defendants are correct that "where all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings."  *Arrigo*, 704 F. Supp. 2d at 305 (citation and alteration omitted); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 491 (S.D.N.Y. 2008); *see Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (Sotomayor, J.) (implying that

district court has discretion to dismiss rather than stay case, by stating that "[w]e urge district courts in these circumstances to be as clear as possible about whether they truly intend to dismiss an action or mean to grant a stay").  However, the Second Circuit has noted that the decision between dismissal and stay has implications for the speed with which arbitration may begin, because a dismissal is an appealable order, whereas a stay is not.  *See Salim Oleochemicals*, 278 F.3d at 93.  Because "[u]nnecessary delay of the arbitral process through appellate review is disfavored, . . . [d]istrict courts should continue to be mindful of th[e] liberal federal policy favoring arbitration agreements when deciding whether to dismiss an action or instead to grant a stay."  *Id.* (citations omitted).  Courts in this district have heeded this admonition and chosen to stay proceedings, even where urged to dismiss.  *See, e.g.*, *Duraku v. Tishman Speyer Props., Inc.*, 714 F. Supp. 2d 470, 475 (S.D.N.Y. 2010) (Cote, J.); *Douce v. Origin ID TMAA*, No. 08 Civ. 483 (DLC), 2009 WL 382708, at *5 (S.D.N.Y. Feb. 17, 2009).  To promote expeditious resolution of this dispute, the Court stays this action pending arbitration.

## IV.    Motion for Conditional Certification

Dixon has also moved for conditional certification of a FLSA collective action pursuant to 29 U.S.C. § 216(b).  However, Dixon—the only plaintiff to opt-in to this lawsuit to date—has agreed to arbitrate her FLSA claims, and has waived the right to bring a collective action with regard to those claims.  She therefore lacks any personal interest in prosecuting this action in this Court on behalf of others who have yet to opt in.  *See Genesis*, 133 S. Ct. at 1529 (after plaintiff's individual claim became moot, "she lacked any personal interest in representing others in this action").  Her motion for conditional certification is therefore denied as moot.  *See id.* at 1529 n.4 ("[N]othing in the nature of FLSA actions precludes satisfaction . . . of the individual's claim before the collective-action component of the suit has run its course."); *Grenawalt v.*

*AT&T Mobility, LLC*, No. 11 Civ. 2664 (ALC), 2013 WL 1311165, at *16, 19–20 (S.D.N.Y. Apr. 2, 2013) (denying as moot motions for conditional certification where one defendant was found not to be employer under FLSA and claims against other two defendants were dismissed in favor of arbitration).

## CONCLUSION

For the reasons stated in the foregoing, defendants' motion to compel arbitration is granted. Dixon's motions to strike and for conditional collective action certification are denied. This case is stayed pending the completion of arbitration. The Clerk of Court is directed to close the motions pending at docket numbers 7, 19, and 24, and to place this case on the suspense docket. The parties are directed to jointly submit a letter to the Court on November 28, 2013 and every 180 days thereafter, updating the Court on the status of arbitration.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: May 28, 2013
     New York, New York